[Cite as *State v. Magee*, 2020-Ohio-4351.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-11-083 |
| | : | O P I N I O N |
| - vs - | | 9/8/2020 |
| | : | |
| CHRISTOPHER M. MAGEE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018-CR-01019

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

The Law Offices of William J. Rapp, Joshua R. Crousey, One East Main Street, Amelia, Ohio 45102, for appellant

**PIPER, J.**

{¶1} Appellant, Christopher Magee, appeals his convictions in the Clermont County Court of Common Pleas for aggravated robbery, felonious assault, assaulting a police dog, resisting arrest, attempted safecracking, and breaking and entering.

{¶2} Magee's convictions stem from an incident that occurred around 2:00 a.m. on October 23, 2018 at Park National Bank ("the Bank") in Clermont County. That morning,

officers with the Union Township Police Department were dispatched to the Bank after the Bank's alarm "dropped." Upon arriving at the Bank, officers saw that the Bank's front door was shattered and observed Magee inside the Bank rummaging through the tellers' documents and drawers. The officers announced their presence and entered the Bank, which caused Magee to flee to the basement. Despite warnings that a K-9 would be released if Magee refused to surrender, Magee remained in the basement and would not comply with the officers' commands.

{¶3} Due to Magee's noncompliance, the officers released a K-9 into the basement and proceeded downstairs shortly thereafter. When the officers entered the basement, Magee lunged at the officers on all fours while making "primate" noises and wielding a flashlight in one hand and a box cutter in the other. A scuffle ensued between Magee and the officers, which resulted in the K-9 biting Magee and an officer before Magee was ultimately apprehended. After Magee was placed under arrest, he and the wounded officer were transported to the hospital and treated for their injuries.

{¶4} As a result of the events, Magee was indicted in November 2018 on one count of aggravated robbery, two counts of felonious assault, one count of assaulting a police dog, one count of resisting arrest, one count of attempted safecracking, one count of breaking and entering, and one count of vandalism. On November 29, 2018, Magee entered pleas of not guilty and not guilty by reason of insanity ("NGRI"). That same day, Magee filed a suggestion of incompetence with the trial court, suggesting to the trial court that he was not competent to stand trial and further moved the trial court to order a psychiatric evaluation of Magee's present mental condition and his mental condition at the time of the offenses. Two days later, the trial court ordered the psychiatric examinations.

{¶5} In January 2019, the doctor who completed Magee's psychiatric evaluation filed her report with the court. A hearing was held regarding the matter, where the parties

stipulated to the admission of the report and the findings and opinions included therein. After the hearing, the trial court issued an entry finding Magee competent to stand trial. Shortly thereafter, Magee moved the trial court for a second psychiatric examination of his mental condition at the time of the offense and for a second competency evaluation pursuant to R.C. 2945.37. In response, the trial court ordered the second psychiatric examination for the purposes of determining Magee's mental status at the time of the offense as part of his NGRI plea, as well as his competency to stand trial. In February 2019, the doctor who completed Magee's second psychiatric evaluation filed her report with the court. A hearing was held regarding the matter, where the parties stipulated to the admission of the report, and the findings and opinions contained therein. In March 2019, the trial court issued an entry finding that, based upon the opinion of the doctor as set forth in her report, Magee was competent to stand trial.

{¶6} In July 2019, the state moved the court for an order prohibiting all attorneys, witnesses, and parties from making or eliciting any statements about Magee's mental health illnesses, disorders, conditions, or infirmities during the course of the jury trial. Magee did not file a response to the state's motion. Thereafter, the trial court issued a decision and entry granting the state's motion, and ordered that Magee could not present evidence related to any diminished capacity defense from lay witnesses or experts. Specifically, the trial court noted that because the two experts who evaluated Magee determined he did not satisfy the criteria for an NGRI defense, any evidence related to Magee's mental state would relate to "diminished capacity," a defense not recognized by Ohio law.

{¶7} The trial court further indicated that the state's motion in limine could be subject to review once a fuller context of the evidence was presented at trial, and that if counsel deemed it appropriate to pursue such evidence during the course of the trial, counsel was to discuss the matter with the trial court outside the presence of the jury.

Defense counsel did not seek to revisit the trial court's initial ruling on the state's motion.

{¶8} In August 2019, the matter proceeded to a jury trial. At trial, an assistant vice president of the Bank, Officers Derek Disbennett, Chris Holden, Jeffrey Joehnk, and Dylan Torok with the Union Township Police Department, and Detective Ken Mullis with the Union Township Police Department testified on behalf of the state. Magee did not testify or present witnesses on his behalf.

{¶9} After the state rested its case-in-chief, Magee moved for acquittal pursuant to Crim.R. 29. Specifically, Magee argued the state failed to prove each and every element of Counts 1, 2, 3, 5, and 6. The trial court denied the motion. On August 27, 2019, the jury found Magee guilty of all counts. Several of the counts merged for sentencing purposes, and Magee was subsequently sentenced to an aggregate 16-year prison term.

{¶10} Magee now appeals, raising three assignments of error. The second and third assignments or error will be considered together.

{¶11} Assignment of Error No. 1:

{¶12} THE TRIAL COURT ERRED AS A MATTER OF LAW BY REFUSING TO ALLOW EVIDENCE SUPPORTING THE NGRI PLEA WHICH WAS NEVER WITHDRAWN.

{¶13} In his first assignment of error, Magee argues the trial court committed structural error by excluding evidence related to his NGRI plea, as that plea was never withdrawn.

{¶14} As an initial note, NGRI is an affirmative defense that a defendant must prove by a preponderance of the evidence. *State v. Monford*, 190 Ohio App. 3d 35, 2010-Ohio-4732, ¶ 70 (10th Dist.). R.C. 2901.01(A)(14) provides: "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness

of the person's acts."

{¶15} "The proper standard for determining whether a defendant has successfully demonstrated this defense and is thus entitled to an NGRI instruction is whether he has 'introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.'" *State v. Bradford*, 12th Dist. Warren No. CA2010-04-032, 2010-Ohio-6429, ¶ 88, quoting *Monford* at ¶ 70. "A trial court does not err in refusing to include an instruction to the jury on the defense of insanity where the evidence presented does not warrant such an instruction." *Id*.

{¶16} In support of his argument, Magee cites to *State v. Cihonski*, 178 Ohio App. 3d 713, 2008-Ohio-5191 (3rd Dist.). In *Cihonski*, the defendant admitted to the conduct with which he was charged, but claimed his actions were not voluntary, and instead were the product of a "reflex action." The defendant also testified he had left a psychiatric hospital a few days prior to the incident. Based upon this testimony, the *Cihonski* court concluded the defendant was advancing a defense of insanity and that by failing to notify the jury of his NGRI plea, the trial court committed structural error. *Cihonski* at ¶ 23. Similarly, Magee argues on appeal that because he did not withdraw his NGRI plea, the trial court committed structural error by failing to instruct the jury regarding his NGRI defense and prohibiting evidence related to his mental state at the time of the offenses.

{¶17} This court, in addition to its sister districts, has rejected similar arguments on appeal, and has found the *Cihonski* structural error analysis inapplicable where the defendant fails to request an NGRI jury instruction and fails to present any evidence showing that at the time he committed the offense he suffered from a severe mental disease or defect. *Bradford* at ¶ 89; *see also Monford* at ¶ 74 (finding *Cihonski* inapplicable where the defendant did not present "one shred of evidence" relating to an NGRI defense or request an NGRI instruction); *State v. Austin*, 1st Dist. Hamilton No. C-110359, 2012-Ohio-

3053, ¶ 10 (rejecting the *Cihonski* structural-error argument where the defendant failed to present evidence on insanity); *State v. Hess*, 4th Dist. Washington No. 13CA15, 2014-Ohio-3193, ¶ 29 (finding *Cihonski* structural-error analysis inapplicable where the record evidence clearly does not support an NGRI defense).

{¶18} In the instant case, despite never withdrawing his NGRI defense, Magee did not present any evidence to demonstrate that he did not know the wrongfulness of his acts nor did he request an NGRI jury instruction. Instead, his entire defense at trial focused on his intent in breaking into the bank; that the box cutter was not a deadly weapon; and that the officer's K-9 bite was not foreseeable. Thus, his defense was not that he committed the acts as a result of a mental disease or defect, which would be indicative of an NGRI defense, but that he did not commit the charged offenses for various reasons.

{¶19} Additionally, Magee elected not to present any testimony regarding his state of mind at the time of the alleged acts. Although there was testimony regarding Magee making "primate noises" when lunging at the officers, such testimony is not evidence of Magee's insanity at the time of the offense. As such, there is nothing in the record that indicates Magee attempted to present an NGRI defense, or that he wished to present such a defense. Consequently, because Magee did not provide "a scintilla of evidence" showing that at the time he committed the offense, he suffered from a severe mental disease or defect, and "failed to adduce any evidence, expert or otherwise, that his mental disorders caused him to be unaware of the wrongfulness of his actions at the time of the offense," we find *Cihonski's* structural error analysis inapplicable in this case. *Bradford* at ¶ 89.

{¶20} Furthermore, we are not persuaded by Magee's argument that the trial court's decision on the state's motion in limine prohibited him from offering evidence in support of his NGRI plea. It is clear from the trial court's decision and entry on the state's motion in limine that the trial court did not determine with finality the admissibility of evidence related

to Magee's mental state at the time of the offense. While the trial court noted in its decision that any evidence related to Magee's mental state was inadmissible in so far as that evidence was used to support a diminished capacity defense, the trial court specifically stated that the state's motion in limine could be subject to review after a fuller context of the evidence was presented at trial. The trial court further indicated that if, during the course of trial, counsel determined it was necessary to pursue evidence related to Magee's mental state, counsel was permitted to discuss the matter with the trial court outside the presence of the jury.

{¶21} At trial, Magee did not seek to revisit the trial court's ruling on the state's motion, nor did he attempt to introduce evidence related to his NGRI plea as permitted by the trial court's order. Consequently, although Magee did not present any evidence related to his mental state at the time of the offense, we find the trial court's initial ruling on the state's motion in limine did not prohibit him from doing so. Rather, if Magee considered the evidence necessary to prove his NGRI defense, he was required to discuss the evidence with the trial court, which Magee elected not to do.

{¶22} In light of the above, because Magee was permitted, but failed to present evidence at trial to support an NGRI defense, the trial court did not err in not instructing the jury on the defense. *Bradford* at ¶ 88. Accordingly, we overrule Magee's first assignment of error.

{¶23} Assignment of Error No. 2:

{¶24} THE JURY ERRED BY FINDING APPELLANT GUILTY WHEN THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION.

{¶25} Assignment of Error No. 3:

{¶26} THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶27} In these two assignments of error, Magee argues that his convictions for

felonious assault in Count 3 and attempted safecracking in Count 6 are against the manifest weight of the evidence and are not supported by sufficient evidence. Magee only challenges the weight of the evidence and the sufficiency of the evidence as to Counts 3 and 6.

{¶28} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶29} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶30} Because the sufficiency of evidence is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding the evidence is sufficient. *State v. Stringer*, 12th Dist. Butler No. CA2012-04-095, 2013-Ohio-988, ¶ 30. Therefore, a determination that a conviction is supported by the

weight of the evidence will also be dispositive of whether the evidence was sufficient. *Id.*

{¶31} At trial, the state first presented testimony from Jana Beal, an assistant vice president of the Bank. Beal testified that as part of her duties, she oversees all of the Bank's retail banking centers, including the Eastgate Office in Clermont County. In overseeing the retail banking centers, Beal indicated she services the surveillance videos and records that the Bank maintains.

{¶32} Beal testified that on October 23, 2018, she received an alarm drop call around 2:00 a.m., which indicated there was a break-in through the Bank's front door motion sensors. Later that morning, Beal reviewed the Bank's surveillance footage from the incident. The surveillance footage was played for the jury during Beal's testimony and admitted into evidence. The first excerpt of the Bank's surveillance footage shows Magee arriving at the Bank's ATM at 2:05 a.m. on October 23, 2018. Upon arriving, Magee reaches out of his window towards the ATM with what appears to be a slender piece of metal. At that point, it appears Magee uses the object to hit or pry at the ATM. After reviewing the footage, Beal confirmed at trial that no debit card was placed into the ATM, nor was any ATM transaction attempted around 2:05 a.m. She further confirmed that aside from the video, she had no knowledge or information that Magee tampered with the ATM. According to Beal, the cash within the ATM is stored securely, and an individual could not obtain cash from the ATM without a debit card.

{¶33} The next excerpt of the Bank's surveillance footage shows Magee at the Bank's front doors at 2:06 a.m. After one minute at the front door, the footage shows Magee tossing an object through the front door of the Bank, shattering the door's glass. The footage then shows Magee unlocking the front door and entering the Bank. After entering the Bank, Magee is shown walking through various areas of the Bank with a flashlight, and entering the room where the vault is held. According to Beal, the vault is kept locked

overnight and on a time delay. Magee then returns to the main area, and can be seen rummaging through the tellers' desks and the Bank's drive-through desk. At the end of the clip, Magee opened a doorway to another hallway. Beal testified that hallway leads to the Bank's lower level, which does not have cameras.

{¶34} The next segment of surveillance footage shows officers escorting Magee from the door that Beal indicated leads to the Bank's lower level. At that point, Magee was in handcuffs. Thereafter, the footage shows Magee being escorted to the front lobby of the building while the officers can be seen completing a search of the remainder of the Bank. The footage concludes with Magee being escorted out of the Bank.

{¶35} In addition to explaining the surveillance footage, Beal further testified that she did not know Magee and that he did not work at the Bank. Beal also indicated no individuals were permitted to be inside the Bank at 2:00 a.m. As a result of the incident, Beal stated the Bank sustained damage to various areas, however, she confirmed there was no damage to the ATM or the vault.

{¶36} The officers who initially investigated the incident at the Bank also testified at trial. Officer Disbennett testified he responded to an alarm at the Bank around 2:11 a.m. on October 23, 2018. Additional officers, including Officers Joehnk and Holden, arrived at the Bank shortly after. Upon arriving on the scene, Officer Disbennett observed a black SUV near the front door of the Bank and advised dispatch of the license plate number. At that point, Officer Disbennett observed that the front door or window was busted and directed the additional officers to set up a perimeter around the Bank.

{¶37} Upon his arrival, Officer Disbennett indicated he observed a male, later identified as Magee, inside the Bank. According to Officer Disbennett, Magee had a flashlight and was looking through the drawers behind the teller counter. At that point, Officers Disbennett and Joehnk entered the Bank. Officer Disbennett announced the

officers' presence to Magee and stated, "let me see your hands." In response, Magee ran to the nearby hallway towards the lower level of the Bank. Upon learning that Magee had fled from the main area of the Bank, Officer Holden entered the Bank with his K-9 unit. Officer Holden then heard noises coming from the basement of the Bank, which prompted him to alert the other officers. At that point, Officer Holden warned Magee three times that if he did not surrender, a K-9 unit would be released into the basement. After Magee failed to surrender, Officer Holden released the K-9 into the basement and the three officers followed slightly behind.

{¶38} Upon entering the basement of the Bank, the officers noticed the K-9 initially went to the back of the basement. At that point, Magee jumped out from the left-hand side of the basement and positioned himself between the K-9 and the officers. When Magee initially jumped out in front of the officers, he was acting like "a primate," making grunting and growling noises on all fours, then rising up and lunging towards the officers. While Magee was lunging at the officers, Officer Disbennett noticed Magee had an "orange knife" in one hand, which looked like "a utility or a razor blade," and a black object in the other hand. Upon further investigation, Officer Disbennett confirmed the orange item was a box cutter and the black item was a flashlight. While Officer Disbennett could not recall whether the knife's blade was exposed during the encounter, Officer Joehnk testified he was at the highest vantage point and could vividly recall that "the blade was exposed out of – out of the box cutter." Officer Joehnk further testified that during the encounter, he observed Magee holding the knife in front of him, with the blade extended.

{¶39} During Magee's initial confrontation with the officers, Officer Holden commanded the K-9 to attack and a struggle between the officers, the K-9, and Magee ensued. Officer Holden testified Magee quickly approached the officers, which prompted Officer Holden to strike Magee in the side of the head with a closed first. At that point,

Magee hit Officer Holden in the head with the flashlight and the K-9 latched onto Magee's right arm area. While the K-9 was latched onto Magee's arm, Officer Holden observed Magee attempting to strike the dog. The K-9 then released from Magee's arm, and reengaged on his right bicep.

{¶40} Officer Disbennett then holstered his weapon and initiated contact with Magee on the ground. According to Officer Disbennett, Magee initially had both hands under his body, resisting arrest. Despite the officers repeated commands to stop resisting, Magee was "very violent and turbulent," "just not complying with any instructions," and constantly trying to push himself up. By that time, the K-9 had disengaged from Magee's arm and the officers were trying to secure Magee's hands behind his back. The struggle between the officers and Magee continued, and the K-9 ultimately circled back and latched onto Officer Disbennett's leg. According to Officer Disbennett, he did not strike or provoke the K-9 to bite his leg. After being commanded to release, the K-9 detached from Officer Disbennett's leg and the struggle between the officers and Magee continued, including Magee raising to all fours before being broken back down onto his stomach. At that point, Officer Joehnk attempted to deploy his department-issued taser, however, due to the close proximity, the electricity did not work. Officer Joehnk indicated that in order for the taser to work, Magee needed to be further subdued, however, he was "unable to do that because Mr. Magee was not complying" and continued "thrashing around." Ultimately, Officer Joehnk and Officer Disbennett were unable to secure Magee in handcuffs until additional officers responded.

{¶41} After placing Magee under arrest, the officers searched the basement of the Bank for additional individuals. Although Magee mentioned to the officers that his girlfriend may be in the Bank, the officers were unable to locate any additional individuals after searching the basement, the offices upstairs, and the remainder of the business. At that point, the officers walked Magee out of the basement to the main level of the Bank and

attempted to transport Magee to a patrol car. During the transfer, Magee began thrashing, kicking, and biting the car's light bar. Magee was ultimately subdued with restraints and placed into the vehicle.

{¶42} As a result of the K-9 bite, Officer Disbennett was transported to the hospital where he received multiple stitches on both sides of his right leg.

{¶43} The state also presented testimony from Ken Mullis, the Detective with Union Township Police who investigated the incident at the Bank. The detective testified that he was called to the scene at approximately 2:20 a.m. on October 23, 2018. When he arrived, the scene was secured and Magee was in custody. After speaking with the officers involved in the initial struggle, the detective conducted a walk-through of the scene. While in the basement, the detective discovered and collected the small flashlight and the orange box cutter. The detective indicated that just outside the box cutter was a razorblade. According to the detective, in his experience, box cutters or razors have been used in the commission of a crime, and can inflict cut marks, slash marks, incise wounds, and death.

{¶44} The detective further testified that in processing the scene on the outside of the bank, he discovered a large glass ball in the middle of the Bank's driveway. The detective stated it was obvious the glass ball did not belong at the Bank. Upon further examination of the glass ball's weight and chipped appearance, the detective determined the glass ball was "consistent with potentially being utilized to break the window" of the Bank's door. After reviewing the surveillance footage, the detective confirmed that Magee's movements by the door were consistent with throwing the glass ball through the door in order to gain entry into the Bank.

### Specifically As To Count 3 – R.C. 2903.11(A)(1)

{¶45} In Count 3, Magee was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides in relevant part that "[n]o person shall knowingly cause

serious physical harm to another." The indictment further alleged that Magee committed the offense against a peace officer.

{¶46} Magee argues the state failed to sufficiently prove the element of causation, as it was "not foreseeable or likely that the K-9 would attack its own holder or one of the officers." Magee further contends it was only foreseeable that the K-9 would pose a threat to Magee himself, and that the K-9 could be controlled by the officers. Thus, Magee claims there is no evidence to suggest that he either intended or foresaw that the K-9 would attack one of its own officers.

{¶47} "'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39 (1978). An accused need not foresee the precise consequences of his conduct. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 46. "To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct." *Id.*, citing *State v. Spates*, 8th Dist. Cuyahoga No. 100933, 2015-Ohio-1014, ¶ 54.

{¶48} After review of the record, we find the jury did not lose its way and create a miscarriage of justice in finding Magee guilty of felonious assault against a peace officer. The trial court issued the following jury instructions regarding the element of "cause":

> Cause is an act or failure to act which in a natural and continuous sequence, directly produces the physical harm and without which it would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act.
>
> The Defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or failure to act. There may be one or more causes of an event; however, if a Defendant's act or failure to act was one cause, then the existence of other

> causes is not a defense. The Defendant is responsible for the natural consequences of his unlawful act or failure to act, even though physical harm to the peace officer was also caused by the intervening act or failure to act of another person or agency.

{¶49} It is undisputed that Magee set into motion the sequence of events by fleeing to the basement of the Bank, refusing to surrender, lunging at the officers with a box cutter, and resisting arrest. Additionally, aside from attempting to subdue Magee, the record reflects Officer Disbennett did not provoke the K-9 to bite his leg. Instead, the record indicates the officer was injured after Magee ignored three warnings that if he did not surrender, a K-9 would be released into the basement. Rather than surrender, Magee resisted arrest and began wrestling with the officers on the ground. Magee continued resisting and fighting with the officers after the K-9 had latched onto his arm twice. After the K-9 released Magee, he continued to behave "very violent[ly] and turbulent[ly]," refusing to comply with any instructions, and trying to push himself off the ground. This tumultuous situation, created solely by Magee's unruly behavior and resistance, resulted in the K-9 biting Officer Disbennett's leg.

{¶50} We further find that given Magee's behavior, it was foreseeable that an officer could be injured when Magee chose not to comply with the officers, but rather to create a physical confrontation. Specifically, despite knowing that the K-9 was in the basement and that it had been commanded to attack, Magee lunged at the officers with a weapon and proceeded to wrestle with the officers on the ground for several minutes. In light of the circumstances, we find the officer's injury was within the natural and logical scope of risk created by Magee's conduct and that the injury would not have occurred if Magee had surrendered immediately or complied with the officers. Thus, in accordance with the above, Magee is responsible for the natural and foreseeable consequences or results that follow from his actions, including that the K-9 would attack and injure someone during the scuffle.

However, even if the precise consequences of Magee's conduct may not have been foreseeable, that is, that the K-9 would divert from his training and attack the officer, it was certainly foreseeable to Magee that an officer could sustain physical injury as a result of his conduct. Therefore, when considering the testimony presented at trial, the jury did not clearly lose its way in concluding that Magee's actions caused the injury to Officer Disbennett.

{¶51} Accordingly, when viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Magee knowingly caused serious physical harm to another, a police officer, and therefore committed the crime of felonious assault. We similarly conclude the jury did not create a manifest miscarriage of justice so as to require a new trial and that Magee's conviction is not against the manifest weight of the evidence.

**Specifically As To Count 6 – R.C. 2923.02/2911.31(A)**

{¶52} In Count 6, Magee was convicted of attempted safecracking in violation of R.C. 2911.31(A) which provides, "[n]o person with purpose to commit an offense, shall knowingly enter, force an entrance into, or tamper with any vault, safe, or strongbox." This court has indicated that an ATM can be classified as a "safe" under R.C. 2911.31 as an ATM is a receptacle which purpose is to dispense money to customers and to keep the money inside the ATM safe. *State v. Jackson*, 12th Dist. Butler No. CA2011-06-096, 2012-Ohio-4219, ¶ 52. Attempt is defined as when a "person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct, that if successful, would constitute or result in the offense." R.C. 2923.02(A).

{¶53} Magee argues the state failed to prove that he tampered with the ATM. In the context of R.C. 2911.31(A), "tamper" has been defined as "to meddle so as to alter," "to make changes that are illegal, corrupting, or perverted," or "to interfere improperly." *State*

*v. Richardson*, 12th Dist. Clermont No. CA2012-06-043, 2013-Ohio-1953, ¶ 13. According to Magee, the evidence presented at trial merely suggested he "made a gesture" towards the ATM, not that he caused any damage to the ATM or took anything from the ATM.

{¶54} After a review of the record, we find that Magee's conviction for attempted safecracking is supported by sufficient evidence and is not otherwise against the manifest weight of the evidence. The surveillance footage shows Magee reaching out of his car window with what appears to be a thin piece of metal, which he then moves up and down in attempts to hit at or pry into the ATM. At trial, Detective Mullis indicated he believed the footage showed Magee was prying at the ATM. Additionally, while Beal testified that aside from the video, she had no knowledge or information that Magee tampered with the ATM, she confirmed no ATM transaction was attempted nor was any debit card placed into the ATM at that time.

{¶55} While Magee argues the evidence proves that Magee simply "made a gesture" towards the ATM, we find the jury could reasonably conclude that Magee was prying at the ATM in order to interfere with the machine. Specifically, the surveillance footage, coupled with Beal's testimony, establishes that Magee was not reaching towards the ATM with the metal object in an attempt to complete a legitimate transaction at the ATM. Thus, the jury could reasonably deduce that in using the metal object to hit and pry at the ATM, Magee was attempting to improperly gain access to the contents of the ATM. Such a conclusion reasonably follows from the totality of Magee's actions that morning, including Magee's decision to shatter the front door of the Bank in order to search inside the Bank and its vault, as well as the lack of a legitimate transaction at the relevant time period. Accordingly, we find that jury did not lose its way in concluding that Magee knowingly attempted to tamper or interfere improperly with the ATM.

{¶56} Based on the above, we find that Magee's convictions for felonious assault

and attempted safecracking are not against the manifest weight of the evidence. Additionally, the state presented evidence which, if believed by the jury, would allow it to conclude that all of the elements of Magee's convictions were proven beyond a reasonable doubt.

{¶57} Accordingly, Magee's remaining assignments of error are overruled.

{¶58} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.