[Cite as *State v. Hathorn*, 2023-Ohio-3936.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

ROBERT T. HATHORN,

    DEFENDANT-APPELLANT.

CASE NO. 5-22-17

O P I N I O N

Appeal from Hancock County Common Pleas Court
Trial Court No. 2021 CR 421

Judgment Affirmed

Date of Decision:  October 30, 2023

APPEARANCES:

    *Jesse E. Scott* for Appellant

    *Phillip A. Riegle* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Robert Hathorn ("Hathorn") brings this appeal from the judgment of the Court of Common Pleas of Hancock County convicting him of six counts along with two firearm specifications. On appeal Hathorn claims that the trial court erred by 1) allowing standby counsel to conduct voir dire, 2) allowing an expert to testify to matters outside the area of expertise, 3) failing to conduct a competency hearing, 4) failing to merge allied offenses, and 5) imposing an erroneous sentence. Hathorn also claims that the state failed to present sufficient evidence and engaged in prosecutorial misconduct. For the reasons set forth below, the judgment is affirmed.

*Factual Background*

{¶2} On December 6, 2021 Ohio State Highway Trooper Josef Brobst ("Brobst") initiated a traffic stop of a black SUV for speeding. While following the vehicle, Brobst also noticed that it had no visible license plate. Brobst activated his emergency lights and the driver of the SUV pulled to the side of the highway. Upon approaching the vehicle on the passenger side, Brobst learned that the driver of the vehicle was Hathorn. Brobst detected the odor of marijuana coming from the vehicle. Brobst had Hathorn exit the vehicle and Brobst performed a pat-down search for weapons. Finding no weapons, Brobst began speaking to Hathorn alongside the highway.

{¶3} Brobst called in Hathorn's information to dispatch and then advised Hathorn of his *Miranda* rights. Brobst then asked Hathorn about the odor of marijuana coming from the vehicle. Hathorn indicated that the passenger had smoked marijuana in Michigan prior to getting in the vehicle. Brobst informed Hathorn that due to the odor of marijuana he had probable cause to search the vehicle and was waiting for another unit to arrive before conducting the search, as was required by Ohio State Highway Patrol's policy. Brobst also informed Hathorn that he would issue a warning on the speed and a citation for the seat belt violation. The two engaged in small talk while waiting for the second unit to arrive. Eventually Hathorn asked if they were waiting for the other unit or just waiting for Brobst to write the ticket. Brobst responded that they were waiting for the other unit. Hathorn then punched Brobst in the left side of the face and a struggle began.

{¶4} Hathorn and Brobst began wrestling and Brobst attempted to prevent Hathorn from reaching his duty weapon. Hathorn then reached for Brobst's taser and Brobst yelled at him. They continued to struggle and eventually fell over the guardrail on the side of the road and fell to the ground. The struggle continued with Hathorn on top of Brobst and Brobst's hands on Hathorn's shoulders trying to control him. Brobst then heard a gunshot and felt pain. Brobst yelled at Hathorn to get off of him and the fight continued. Eventually Hathorn got off Brobst and ran back to his vehicle. Brobst then pulled his weapon and attempted to fire at Hathorn,

but the weapon would not fire. Hathorn left the scene. Brobst advised dispatch that he had been shot and requested back up.

{¶5} While officers were dispatched to the scene, the Findlay Police Department received a call about a semi-truck accident near the scene. The truck was stopped at a traffic light near an exit ramp from the highway. When the light turned green, the truck began to move when an SUV exited the highway and ran the light, pulling in front of the truck. The truck struck the SUV, but the SUV immediately left the scene going west. A search for the SUV was then started. The abandoned vehicle was eventually located hidden in a field and a search of the interior of the vehicle was completed.

{¶6} Police then learned that Hathorn was spotted near County Road 223. The area was searched and police found Hathorn hiding inside an old, metal incinerator. Hathorn was arrested without incident. After being advised of his *Miranda* rights, Hathorn made statements about the shooting. Hathorn had sustained an injury to his left index finger during the incident with Brobst and was taken to the hospital for treatment. Hathorn made a recorded statement to the police at the hospital after again being advised of his *Miranda* rights.

*Procedural History*

{¶7} On October 19, 2021, the Hancock County Grand Jury indicted Hathorn on six counts: 1) Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the first degree; 2) Aggravated Robbery in violation of R.C. 2911.01(B), a felony

of the first degree; 3) Having Weapons While Under Disability in violation of R.C. 2923.13(A)(2), a felony of the third degree; 4) Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree; 5) Failure to Comply with Order or Signal of Police Officer in violation of R.C. 2921.331, a felony of the fourth degree; and 6) Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Firearm specifications were attached to Counts One and Two. Retained counsel for Hathorn entered a notice of appearance on November 18, 2021. During the pretrial hearing on January 27, 2022, Hathorn discharged his counsel and requested to either be given time to find new retained counsel or to represent himself. The trial court then granted a continuance. On February 14, 2022, the trial court appointed Alex Treece ("Treece") as counsel for Hathorn after finding Hathorn to be indigent. On May 9, 2022, Hathorn filed a waiver of right to counsel indicating that he wished to represent himself. The trial court on May 16, 2022, granted Hathorn's request to represent himself, but appointed Treece to act as standby counsel.

{¶8} A jury trial was held in June 2022. At the conclusion of the trial, the jury found Hathorn guilty on all counts, including the firearm specifications. The trial court conducted a sentencing hearing on July 13, 2022. The trial court noted that Counts Three and Four were subject to merger and the State chose to proceed to sentencing as to Count Three. The trial court then imposed the following prison terms for each remaining count: Count One – 10 to 15 years, along with an

Case No. 5-22-17

additional seven years for the firearm specification; Count Two – seven years;

Count Three – 12 months; Count Five – 12 months; and Count Six – 12 months.

Doc. 191. The trial court then made the findings to impose consecutive sentences

as required by R.C. 2929.14 and ordered all of the sentences, except that imposed

as to Count 3, be served consecutively for an aggregate prison term of 26 to 31

years. Hathorn appealed from this judgment. On appeal, Hathorn raises the

following assignments of error.[1]

### First Assignment of Error

**The trial court erred when it allowed standby counsel to conduct the voir dire examination after [Hathorn] had knowingly, intelligently, and voluntarily waived his right to counsel in violation of [Hathorn's] Sixth and Fourteenth Amendment rights to self-representation.**

### Second Assignment of Error

**The trial court erred when it failed to merge counts one and two of the indictment because they are allied offenses.**

### Third Assignment of Error

**The trial court erred by improperly allowing a firearms examiner to testify as an expert on firearm holsters when that firearms examiner had no training in the area pursuant to Evid.R. 702**

### Fourth Assignment of Error

**The State failed to present sufficient evidence to sustain a conviction.**

---

[1] The first five assignments of error were filed by original appellate counsel. Then new counsel took over and filed a supplemental brief with four additional assignments of error.

-6-

**Fifth Assignment of Error**

**The trial court erred by sentencing [Hathorn] to an indefinite sentence pursuant to the Reagan Tokes Act.**

**Sixth Assignment of Error**

**In the alternative to Error of Assignment 1 [sic], the trial court committed error when it failed to provide a competency hearing to determine if [Hathorn] was fit to stand trial.**

**Seventh Assignment of Error**

**In the alternative to Error of Assignment 1 [sic], the trial court erred and deprived [Hathorn] of his right to counsel when it failed to ensure that [Hathorn] had made a voluntary, knowing, and intelligent waiver of his right to counsel.**

**Eighth Assignment of Error**

**The State engaged in prosecutorial misconduct in closing arguments resulting in unfair prejudice against [Hathorn].**

**Ninth Assignment of Error**

**The State failed to present sufficient evidence to sustain a conviction in Counts One through Four.**

In the interests of clarity, we will discuss the assignments of error out of order.

*Competency of Defendant – Sixth Assignment of Error*

{¶9} In the sixth assignment of error, Hathorn claims that the trial court erred by not *sua sponte* holding a competency hearing to determine whether Hathorn was fit to stand trial. Hathorn did not raise this issue to the trial court, thus we will review it under a plain error standard. "Under this standard, the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the

proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, ¶ 22, 200 N.E.3d 1048.

{¶10} Hathorn claims that the trial court should have realized he was likely incompetent to stand trial and *sua sponte* ordered a competency hearing. Ohio law has long recognized that a person who lacks the ability to understand the nature and purpose of the proceedings, to work in consult with his or her counsel, and to assist in the preparation of a defense may not be subjected to a trial. *State v. Hough*, 169 Ohio St.3d 769, 2022-Ohio-4436, ¶ 21, 207 N.E.3d 788. A determination of competency of a defendant depends on whether he "has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 45, 890 N.E.2d 263. The presumption is that a defendant is competent to stand trial. R.C. 2945.37(G).

> In a criminal action in a court of common pleas, * * * the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion.

R.C. 2945.37(B). "Due process requires a court to hold a hearing when it has been presented with a 'sufficient indicia of incompetence.'" *State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, ¶ 51, 179 N.E.3d 1216. In cases where the trial court

does not hold a competency hearing, the failure is harmless error when the record fails to reveal sufficient indicia of incompetency. *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986).

{¶11} Incompetency in Ohio is not "equated with mere mental or emotional instability or even with outright insanity." *Id.* A defendant may be psychotic, yet still capable of understanding the charges brought and of assisting counsel. *Id.* Thus, to determine whether there is indicia of incompetency, this Court must look for indications that Hathorn did not understand the charges against him and, in this case, that he was incapable of rationally presenting a defense.

> "When a trial court is confronted with whether to order a competency hearing sua sponte, 'relevant considerations include: (1) doubts expressed by counsel as to the defendant's competence; (2) evidence of irrational behavior; (3) the defendant's demeanor at trial; and (4) prior medical opinion relating to competence to stand trial.' " * * * Absent indicia of incompetency, however, the trial court need not hold a competency hearing.

*State v. Stiltner*, 3d Dist. Defiance No. 4-19-08, 2019-Ohio-4631, ¶ 8 (citations omitted).

{¶12} Here, Hathorn indicates that the trial court should have *sua sponte* held the hearing because Hathorn indicated he was unhappy with his retained counsel's work. At the January 27, 2022 hearing, Hathorn indicated he wanted new counsel because he was unhappy with the representation. Hathorn claimed that counsel was not meeting with him and was not working on the case. This unhappiness apparently arose from Hathorn wishing counsel to file a motion to "test the evidence", which

-9-

counsel refused to do because there is no basis for such a motion under Ohio law. This misunderstanding of what the law permits in Ohio is not a sign of lack of competency to stand trial, but rather a lack of understanding of criminal procedure in Ohio.

{¶13} Hathorn next claims that the trial court should have suspected he was incompetent because he indicated that he did not want appointed counsel. Hathorn indicated that he believed appointed counsel would not be effective because they were paid by the State. Hathorn indicated that he would prefer to represent himself if he could not find new retained counsel. "From my past experience, if I don't have a paid attorney, I'm going to prison anyway, you know?" Jan. 27 Tr. 26. Hathorn then followed through on this position when he could not find retained counsel and indicated he wished to represent himself. After much discussion with the trial court, Hathorn identified an attorney, Treece, he wished to represent him and the trial court subsequently appointed Treece to represent Hathorn.

{¶14} By May, Hathorn was back to wanting to represent himself. When asked why, he responded as follows.

> I feel like, I know my case better than, you know, anybody, and I feel like this is my life on the line, and I'd rather, you know, be in this Court representing myself. If any mistakes made [sic], I'd rather me make the mistake, because I'm going to have to do time for it.
>
> And you know, I felt like no matter what kind of counsel that you appoint me, the Prosecution is always going to have an influence on that – on that – on that counsel. You know? Is a lot of things that I haven't been understanding that's been going on around here, but I

understand because I have been through it so many times. I don't feel like a Court-appointed attorney, he's paid by the State. He's paid by the same person that pays her, pays you, you know? He's not my defense counsel. I know you feel differently, and I know the law feels differently. * * *

But I know from my experience, your Honor, you know, I have bad experience with Court-appointed attorneys in my lifetime, very bad experience. * * *

I can't articulate myself like these attorneys, like the Prosecutor, and like the – like the lawyers, but I know my case. I know the laws on my case. You know, and I might make mistakes, and I might say things, but like I said, I'd rather have my life in my hands than anybody else.

May 4 Tr. 10-11. The dialogue above as well as the comments in January and February regarding the perceived bias of appointed counsel do not indicate that Hathorn lacked competence. Instead they indicate that Hathorn, based upon his experiences in life, did not trust appointed counsel. Hathorn's lack of trust in the system, as foolish as a court may consider it, is based upon his past and rational conclusions based upon his experiences. This does not raise concerns about competency.

{¶15} A review of the record shows that Hathorn represented himself and was able to question witnesses in an appropriate manner. He was able to ask relevant questions on cross-examination that furthered his defense. Hathorn was also able to work with Treece, his standby counsel, and did so as needed, including allowing Treece to conduct the voir dire with the trial court's permission. The record indicates only one instance where Hathorn's conduct could be deemed

irrational and that was after he returned from the hospital in severe pain. This did not occur in the presence of the jury and the trial court allowed him additional time to recover rather than continuing with the trial. Although Treece did question Hathorn's competency to proceed on the morning of June 10, 2022, it was in a limited context.

> The Court: It's been reported to the Court that Mr. Hathorn has an injury, illness or condition which has manifested itself from last evening until today.
>
> Mr. Treece, did you discuss that with Mr. Hathorn?
>
> Mr. Treece: I have. He has some sort of injury or something on his elbow. It's actually – he's numb on his right arm. And frankly, I think he's suffering from some sort of maybe emotional or mental condition *because of it* as well. He's not making complete sense when I talk to him but it's clearly affecting him and his abilities.

Tr. 1280-81 (emphasis added). Treece was not referring to Hathorn's mental status throughout the trial, but at the time right after the injury. Given the record before us, this Court does not find that there was sufficient indicia of incompetency to require the trial court to *sua sponte* order a competency evaluation. The sixth assignment of error is overruled.

*Waiver of Counsel – Seventh Assignment of Error*

{¶16} Hathorn claims in the seventh assignment of error that the trial court erred by failing to ensure that Hathorn's waiver of counsel was voluntarily, knowingly, and intelligently made. The basis for this claim is that Hathorn lacked the competence to enter a valid waiver. This Court notes that the question of the

-12-

competency was resolved above. The record does not contain indicia that Hathorn

lacked the competence to enter a valid waiver. Thus, we will only need to consider

whether the waiver was properly made.

> "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused – whose life or liberty is at stake is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Von Moltke v. Gillies,* 332 U.S. 708, 723-24, 68 S.Ct. 316, 92 L.Ed. 309 (1948),

quoting *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)

(overruled on other grounds). See also *State v. Gibson*, 45 Ohio St.2d 366, 345

N.E.2d 399 (1976), *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816

N.E.2d 227, and *In re C.B.*, 3d Dist. Auglaize Nos. 2-11-13, 2-11-14, 2012-Ohio-

5143, ¶ 7. Generally, there is a presumption against the waiver of counsel and the

State bears the burden of proving that the waiver was valid. *State v. Jackson*, 3d

Dist. Seneca No. 13-14-30, 2015-Ohio-1694, ¶ 4.

**{¶17}** A review of the record in this case shows that the issue of Hathorn representing himself was discussed over multiple hearings. The matter was extensively discussed on May 4, 2022, and the trial court continued the matter until May 9, 2022, to allow Hathorn more time to fully consider his decision. The trial court repeatedly attempted to dissuade Hathorn from representing himself and even informed Hathorn that it was not a wise choice.

> I've done this in the recent past, where I have regrettably allowed people to represent themselves. I think it's a foolhardy determination on your part. I think it's the absolute worst thing you can do, but it is your constitutional right.

May 4 Tr. 23. The trial court also attempted to find new appointed counsel, including contacting the State Public Defender's Office so that Hathorn would not need to represent himself. Hathorn indicated that he still wished to represent himself.

> Hathorn: I appreciate, your Honor. I appreciate everything that – that you trying to do, trying to get me right counsel, and – but I really truly feel in my heart that I can represent myself.

May 4 Tr. 22. Hathorn did agree to allow Treece to act as standby counsel in a compromise. Hathorn indicated that he had some experience researching cases from his prior time in prison. Hathorn also indicated that he had started reading the Ohio Rules of Criminal Procedure in preparation of representing himself. Throughout the remainder of the May 4 hearing, the trial court warned Hathorn of how he would be required to comply with the rules and the short time he would have to learn those

-14-

rules. The trial court also informed Hathorn that the State had the burden of proof, that he would have to subpoena his own witnesses, and that he would have to request his own expert witnesses if he needed one. Finally, the trial court discussed with Hathorn what the potential penalties of the offenses charged would be. The trial court then continued the matter until the next hearing.

{¶18} On May 9, 2022, the trial court held another hearing on Hathorn's request to represent himself. The trial court again discussed the potential penalties for the offenses charged and warned Hathorn that the maximum possible sentence was 38 years in prison. Hathorn then indicated he still wished to represent himself. The trial court continued to warn Hathorn of all the difficulties he would face if he were to represent himself and provided reasons as to why it was a bad idea. Hathorn continued to say he understood the court's concerns, but that h still wished to do so. Eventually, the trial court determined that although the court believed the decision to be wrong, Hathorn was "being very analytical" and allowed Hathorn to represent himself.

{¶19} The record in this case shows that the trial court went above and beyond what is required to determine whether the waiver of counsel was knowing, intelligently, and voluntarily made. Hathorn repeatedly stated he wished to represent himself. He provided numerous reasons for doing so and was fully informed of the seriousness of the offenses, the potential penalties that he was facing, and the risks of self-representation. Hathorn was even given extra time to

reconsider his decision before the trial court accepted it. Given the record before this Court, we conclude that the waiver was knowingly, intelligently, and voluntarily given. The seventh assignment of error is overruled.

*Actions of Standby Counsel – First Assignment of Error*

{¶20} Hathorn claims in his first assignment of error that his right to self-representation was violated when the trial court permitted standby counsel to conduct *voir dire*. Generally, if a party is representing himself or herself, that party is not entitled to hybrid representation where counsel completes some of the tasks as counsel while the party completes others. *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227. Thus, Hathorn was not entitled to have Treece conduct the *voir dire* as the standby counsel. However, it appears from the record in this case that Hathorn agreed to have Treece conduct the *voir dire*. During the May 9, 2022 hearing, the trial court and the parties discussed potentially permitting counsel to conduct *voir dire* in order to prevent Hathorn from accidentally offending the potential jurors with his questions. At the end of the hearing, Treece indicated he and Hathorn would discuss the matter. During *voir dire*, Treece introduced himself and indicated that he and Hathorn would be trying the case together. Although there is no agreement on the record by Hathorn to allow Treece to conduct the *voir dire*, Hathorn did not object to Treece conducting the voir dire. This apparent acquiescence invited any error that may have arisen. "The doctrine of invited error specifies that a litigant may not 'take advantage of an error which he

himself invited or induced.'" *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co., Lincoln–Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. "This court has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." *State v. Campbell*, 90 Ohio St.3d 320, 324, 2000-Ohio-183, 738 N.E.2d 1178. Since Hathorn consented to allowing Treece to conduct the *voir dire*, he cannot now complain that allowing it was reversible error. The first assignment of error is overruled.

*Expert Witness Testimony – Third Assignment of Error*

{¶21} Hathorn claims in his third assignment of error that the trial court erred by allowing the firearms examiner to testify regarding the holster in violation of Evidence Rule 702. The rule states as follows.

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by laypersons or dispels a misconception common among laypersons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Evid.R. 702.

**{¶22}** Hathorn argues that the trial court erred by permitting Matthew White ("White"), the firearms examiner with the Bureau of Criminal Investigation, to testify via deposition not only regarding the gun, but also about the holster and how Hathorn would have been able to access Brobst's firearm while it was in the holster. A review of the record shows that White testified regarding the firearm. While examining the firearm, he also examined the holster and the belt. During his deposition, White testified to his observations about the firearm and its relation to the holster. White then conducted some simple tests and learned that when some pressure was applied to one side of the holster, the gun twisted enough to allow a gap to appear and that the gap provided access to the trigger of the firearm while it was still in the holster. The gap was big enough to get a finger on the trigger and activate it. This was not based upon any training, but upon his own personal observations when he and other examiners were conducting experiments to see how the gun was fired while still in the holster. This testimony was not based upon any

expertise and was thus not the testimony of an expert on firearm holsters. This does not mean, though, that White could not testify regarding the holster.

**{¶23}** Evidence Rule 701 permits witnesses to testify to opinions and conclusions that are drawn from facts observed as long as it is helpful to a determination of a fact in issue. Evid.R. 701. White testified that he conducted tests and found that pressure, either by pushing or pulling the firearm away from the wearer caused the physical gap between the holster and the firearm to increase, causing the trigger to be more exposed. White identified Ex. 18 from the deposition as a picture showing how this was possible. He then identified Ex. 19 from the deposition as pictures showing how his finger could reach the trigger while the gun was still in the holster. Ex. 20 for the deposition showed White being able to access the trigger while a coworker was wearing the holster. White finally testified that one of his coworkers was able to actuate the trigger meaning that it was capable of firing. This testimony did not reflect any scientific expertise, but rather was based upon the witness's own observations. These observations would be helpful to a juror determining whether it was possible for Hathorn to have pulled the trigger while the firearm was still in the holster. Thus, the testimony was permitted pursuant to Evid.R. 701 despite the fact that White is not an expert in firearm holsters. The third assignment of error is overruled.

*Sufficiency of the Evidence – Fourth and Ninth Assignments of Error*

**{¶24}** In the fourth and ninth assignments of error, Hathorn challenges the sufficiency of the evidence.

> A sufficiency analysis "'determine[s] whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1433 (6th Ed.1990). If the state fails to present sufficient evidence on every element of an offense, then convicting a defendant for that offense violates the defendant's right to due process of law. *Id.* at 386-387, 678 N.E.2d 541; see also *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Messenger,* 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 13, 216 N.E.3d 653. The question of whether the evidence presented at trial is legally sufficient to support a verdict is a question of law and questions the adequacy of the evidence. *State v. Hulbert*, 3d Dist. Van Wert No. 15-19-07, 2021-Ohio-2298, ¶ 5. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1981), paragraph two of the syllabus, *superseded by statute on other grounds*. After viewing the evidence in a light most favorable to the prosecution, an appellate court must consider whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts

-20-

nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4557, ¶ 33.

{¶25} In the fourth assignment of error, Hathorn argues that the State failed to present sufficient evidence that he failed to comply with an order or signal of a police officer. Hathorn was indicted for a violation of R.C. 2921.331(B), (C)(4). Thus, the State was required to prove that Hathorn 1) operated a motor vehicle to willfully flee a police officer 2) after receiving a signal to stop and 3) he did so immediately after committing a felony. The undisputed facts in this case clearly show that after the altercation with Brobst, Hathorn fled the scene of the altercation in his vehicle, so the first element of the offense is clearly met. Additionally, viewing the evidence in a light most favorable to the State, it is clear that Hathorn left the scene after Brobst was shot by him, a felony. This meets the third element. This leaves only the second element in dispute – the question of whether the prior signal to stop, with which Hathorn had complied up until that time, was still in effect.

{¶26} This question has been addressed by the 12th District Court of Appeals in *State v. Everitt*, 12th Dist. Warren No. CA2002-07-070, 2003-Ohio-2554. In *Everitt*, the defendant was signaled to pull over and the defendant complied with the signal by coming to a stop on the side of the road. The defendant even left his vehicle to have a discussion with the officer. An argument broke out and the

defendant shoved the officer. At that time, the officer informed the defendant that he was under arrest for assaulting an officer. The defendant then fought with the officer by pushing him down and attempting to get ahold of the officer's weapon. Eventually, the defendant went back to his vehicle and restarted it. He then drove off with the officer hanging out of the window. On appeal, the defendant claimed that his conviction for failing to comply with a signal of a police officer by fleeing in a vehicle was not supported by sufficient evidence. The 12th District Court sustained the conviction finding that the officer had ordered him to quit resisting and give up before the defendant left the scene.

{¶27} Similar to the facts in *Everitt*, Hathorn came to a complete stop in this case and exited the vehicle. Hathorn complied with the police officer's order to stop for several minutes. However, Hathorn then chose to break the compliance by striking Brobst. Brobst testified that during the struggle, he was shouting orders at Hathorn to stop what Hathorn was doing and to get off Brobst. Additionally, the lights atop the cruiser were still active when Hathorn fled from the scene. Brobst also testified that he did not tell Hathorn that he was free to leave at any time. Viewing the evidence in a light most favorable to the State, the evidence was sufficient to support that Hathorn failed to comply with an order or signal of a police officer by fleeing the scene in his motor vehicle. The evidence also supports the conclusion that Hathorn fled the scene immediately after committing a felony.

{¶28} In the ninth assignment of error, Hathorn claims that the evidence was insufficient to support a conviction in Counts One through Four, including the gun specifications attached to Counts One and Two. Count One was a charge of felonious assault in violation of R.C. 2903.11(A)(2). To prove this charge, the State had to prove that Hathorn 1) knowingly caused or attempted to cause 2) serious physical harm to another 3) by using a deadly weapon. R.C. 2903.11(A)(2). Hathorn argues on appeal that the state failed to prove that Hathorn acted knowingly or that he used the deadly weapon. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22. This does not mean that a defendant has to intend the result of the actions, merely that "the defendant acted with an awareness that the conduct probably would cause" the harm that resulted. *State v. McCurdy*, 10th Dist. Franklin No. 13 AP-321, 2013-Ohio-5710, ¶ 16. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 143, 842 N.E.2d 996. A defendant need not foresee the exact consequences of his actions. *State v. Magee*, 12th Dist. Clermont No. CA2019-11-083, 2020-Ohio-4351, 158 N.E.3d 630. "To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct." *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437 ¶ 46.

{¶29} Regardless of whether Hathorn intended to shoot Brobst, he acted with intent when he struck Brobst and then continued to struggle. Brobst testified that Hathorn punched him and then initiated a struggle. Brobst also testified that he was turning in an attempt to prevent Hathorn from getting his firearm. At one point during the struggle, Brobst felt Hathorn grabbing his taser and Brobst told him to stop. When the two continued wrestling, they fell over the guardrail, hit the ground, and began rolling around. Brobst testified that he kept his hands on Hathorn's shoulders to try and prevent Hathorn from reaching his weapons. Brobst was not sure were Hathorn's hands were and then he heard a shot go off and immediately felt a warm sensation and extreme pain. Brobst also testified that during the struggle, his belt was getting twisted back and forth by Hathorn. Since Brobst's hands were on Hathorn's shoulders, Brobst did not fire the firearm, leaving only Hathorn to pull the trigger. Additionally, Allison Mansius, a DNA forensic scientist at the Bureau of Criminal Investigation, testified that she found DNA belonging to Hathorn on the trigger of the gun. Hathorn acted knowingly when he engaged in a struggle with Brobst and attempted to get hold of Brobst's weapons. The fact that a loaded firearm may discharge during a struggle involving the firearm is a within the logical scope of the risk created by Hathorn's behavior. As such, he can be found to have acted knowingly for the purpose of a felonious assault charge.

{¶30} Hathorn also challenges the element that he used a deadly weapon, claiming that there was no evidence that he ever had control of the firearm. A

firearm is defined as a deadly weapon. R.C. 2923.11(B)(1). There is no dispute that no testimony was presented by Brobst or anyone else that Hathorn had control of the weapon. When Brobst removed the weapon, it was still latched in its holster. However, Brobst testified that his hands were on Hathorn's shoulders. Brobst also testified that Hathorn was attempting to get his hands on Brobst's weapons and that he was unable to see Hathorn's hands when the shot fired. White testified that it was possible for a person to get a finger on the trigger and fire the gun while the gun was still in the holster if enough pressure was applied to the side of the holster. Additionally, Hathorn's DNA was found on the trigger. Viewing this evidence in a light most favorable to the State, a reasonable juror could infer from the evidence that Hathorn was the one to control the firing of the gun. Thus, the evidence is sufficient to support the conviction for felonious assault.

{¶31} Hathorn challenges the firearm specification for Count One, in violation of R.C. 2941.1412. This specification applies to one who discharges a firearm at a police officer. Brobst testified that at the time of the offense he was working as a state trooper. As discussed above, the evidence, viewed in a light most favorable to the state, showed that Hathorn fired a firearm and struck Brobst. Thus, the elements of the specification are met. The evidence is sufficient to support the conviction.

{¶32} Hathorn challenges the conviction pursuant to Count Two, aggravated robbery in violation of R.C. 2911.01(B). The statute requires the State to prove that

Hathorn 1) knowingly 2) removed or attempted to remove a deadly weapon 3) from a police officer when 4) the officer is acting within the scope of his duties and 5) the offender knows the officer is an officer. Here, there is no dispute that Brobst was a police officer, that Hathorn knew he was a police officer, or that Brobst was acting within the scope of his duties at the time of the incident. Brobst testified that Hathorn had grabbed ahold of his taser. Brobst also testified that he is left handed so, his firearm was on the left side of his body rather than the right. This would mean that the taser was where the firearm would be on an officer who was right handed. During the struggle, Brobst felt his belt being twisted back and forth and Hathorn's hands were the only ones down that low. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Hathorn was attempting to remove Brobst's firearm when he reached for the taser. The jurors could also reasonably conclude that Hathorn was still attempting to reach the firearm as the struggle continued. Thus, the evidence is sufficient to support the conviction for the aggravated robbery.[2]

{¶33} Counts Three and Four charged Hathorn with having weapons while under a disability. For Count Three, the State was required to prove that Hathorn knowingly acquired, had, carried, or used a firearm after having previously been convicted of a felony offense of violence. The State was required to prove for Count

---

[2] We need not consider whether sufficient evidence supported a finding regarding the second gun specification as the two were determined by the trial court to merge and the State elected to proceed under the first gun specification.

Four that Hathorn had previously been convicted of a felony offense involving the illegal possession, use, sale, or trafficking in drugs. Hathorn stipulated to his prior prerequisite convictions for Counts Three and Four. Tr. 345. This Court has already determined that the evidence was sufficient to show that Hathorn fired the gun in Brobst's holster, which would show that he "used" a firearm. Therefore, the evidence also supports a conviction for having weapons while under disability.

{¶34} Having reviewed the evidence presented and viewed it in a light most favorable to the State, the evidence was sufficient to support convictions in Counts One, Two, Three, Four and Five. The evidence was also sufficient to support the gun specification as to Count One. The fourth and ninth assignments of error are overruled.

*Prosecutorial Misconduct – Eighth Assignment of Error*

{¶35} Hathorn claims in the eighth assignment of error that the State engaged in prosecutorial misconduct by misstating the evidence during closing arguments and injecting statements regarding credibility. "The test regarding prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the defendant's substantial rights." *State v. Harrison,* 3d Dist. Logan No. 8-14-16, 2015-Ohio-1419, ¶ 50, 31 N.E.3d 220. A defendant must show that there is a reasonable probability that, but for the prosecutor's improper remarks, the results of the trial would have been different. *State v. Gideon*, 3d Dist. Allen No. 1-18-27, 2021-Ohio-1863, 174 N.E.3d 381.

Prosecutors may comment during the summation on the evidence and the reasonable inferences that may be drawn from it. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). However, while a prosecuting attorney "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 155, 818 N.E.2d 229 quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶36} Here, Hathorn claims that the prosecutor acted improperly due to the statements made during closing arguments. Hathorn claims that the prosecutor acted improperly by misstating the evidence during closing argument and by indicating that Hathorn's claims were "preposterous". This Court notes initially that closing arguments are not evidence and the trial court properly instructed the jury of this.

> The evidence does not include the indictment, the opening statements or closing arguments of counsel or the Defendant. The opening statements and closing arguments are designed to assist you in your efforts to arrive at a fair and just verdict.
>
> * * *
>
> You are the sole judges of the facts, the credibility of the witnesses, and the weight of this evidence.

Tr. 1376. Thus, the jury was instructed not to consider the statements of the prosecutor when determining what the evidence showed or to consider the beliefs

of the prosecutor when determining the facts. Viewing the whole of the trial, this Court does not find that Hathorn was denied a fair trial due to prosecutorial misconduct. The evidence against Hathorn was substantial and there is little chance that the alleged improper comments affected the outcome of the trial. *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459. Given the evidence and the mitigation caused by the jury instructions, we do not find that the statements by the prosecutor rose to the level of misconduct and affected the outcome of the trial. The eighth assignment of error is overruled.

*Merger of Allied Offenses – Second Assignment of Error*

**{¶37}** Hathorn argues in the second assignment of error that the trial court erred by failing to merge Counts One and Two. "Whether offenses are allied offenses of similar import is a question of law that this Court reviews de novo." *State v. Meeks*, 3d Dist. Defiance No. 4-20-02, 2020-Ohio-5050, ¶ 9.

> A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25, 34 N.E.3d 892.

{¶38} In this case, Hathorn was convicted of felonious assault for shooting Brobst and aggravated robbery for attempting to remove Brobst's firearm. These actions were separate, distinct acts. Hathorn completed the aggravated robbery when he first attempted to get ahold of the firearm. Testimony was presented that he had grabbed the taser, which was in the location where a firearm would normally be on the average officer. After learning it was a taser, Hathorn continued to keep his hands near Brobst's waist and was pulling on Brobst's belt. A reasonable juror could determine that the purpose for Hathorn's conduct was to try and get his hands on the firearm. Thus, these actions support the conviction for the aggravated robbery. Hathorn completed the felonious assault when he fired the firearm, causing serious physical injury to Brobst, which is a different conduct from merely attempting to remove the firearm. Although these actions occurred within a short period of time, that alone does not make them one act. They are still distinct, separate actions and, as such, the actions are not allied offenses of similar import and are not subject to merger. The second assignment of error is overruled.

*Indefinite Sentences – Fifth Assignment of Error*

{¶39} Hathorn's fifth assignment of error alleges that the trial court erred by imposing an indefinite sentence as to Count One pursuant to the Reagan Tokes Act. Specifically, Hathorn claims that the Reagan Tokes Act violates the separation of powers and denies his due process rights, thus making the statute unconstitutional as applied and on its face.

Case No. 5-22-17

**{¶40}** This Court has previously addressed the issue of whether the Reagan Tokes Act violate the separation of powers and due process requirements by allowing the executive branch of the government to determine the ultimate length of the sentence.  This Court has repeatedly determined that the imposition of an indefinite sentence is not unconstitutional on its face or as applied.  *State v. Elliott*, 3d Dist. Logan No. 8-21-35, 2022-Ohio-3778, 199 N.E.3dd 944; *State v. Harrison*, 3d Dist. Logan No. 8-22-05, 2022-Ohio-2537; *State v. Rebarchek*, 3d Dist. Hancock No. 5-21-02, 2021-Ohio-3142; *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547; and *State v. Hacker*, 3d Dist. Logan No. 8-20-01, 2020-Ohio-5048, 161 N.E.3d 112.  The Supreme Court of Ohio recently affirmed our position in *State v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535, ___ N.E.3d ___.  For this reason, the fifth assignment of error is overruled.

**{¶41}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hancock County is affirmed.

*Judgment Affirmed*

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**